## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTOPHER CARZOLI; <br> Staniční 1377 <br> 156 00 Praha 5 <br> Czech Republic <br><br> MANFRED HANSPETER; and <br> V Pěšinách 177 <br> 251 64 Mnichovice <br> Czech Republic <br><br> DONALD MAY <br> Babočková 725 <br> 149 00 Praha 11 <br> Czech Republic <br><br>      Plaintiffs, <br><br>      v. <br><br> RFE/RL, INC. <br> 1201 Connecticut Ave., NW, #400 <br> Washington, District of Columbia 20036 <br><br>      Defendant. | Civil Action No._____  _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Christopher Carzoli, Manfred Hanspeter, and Donald May (hereinafter collectively the "Plaintiffs"), by and through their undersigned attorneys, bring this Complaint for Declaratory Judgment, Damages, Injunctive Relief, and Other Appropriate Relief against their employer, Radio Free Europe/Radio Liberty ("Defendant"), and in support thereof state:

### INTRODUCTION

1.     Plaintiffs bring this action to address violations of the anti-retaliation provisions within the National Defense Authorization Act for Fiscal Year 2013's ("NDAA") enhancement of contractor protections from reprisal for disclosure of certain information, Pub. L. No. 112-239, §

828(a)(1), 126 Stat. 1632 (2013) (codified as amended by Pub. L. No. 114-261, § 795, 130 Stat. 1362, at 41 U.S.C. § 4712 (2016)), against Defendant.

2.     Plaintiffs learned that Defendant engaged in gross misconduct of a Federal contract or grant, gross waste of Federal funds, abused authority relating to a Federal contract or grant, and/or committed violations of law, rule, or regulation pertaining to a Federal contract.

3.     Plaintiffs specifically disclosed their concerns regarding Defendant's aforementioned misconduct to Defendant internally and then externally to the Department of State's Office of Inspector General ("OIG"), the Federal Bureau of Investigations ("FBI"), and the Broadcasting Board of Governors ("BBG"); and Defendant, knowing that Plaintiffs made protected disclosures, retaliated against Plaintiffs by diminishing their duties, systematically undermining their authority, by providing unjustified poor performance evaluations, and ultimately demoting them.

## JURISDICTION AND VENUE

4.     This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the anti-retaliation provisions of the NDAA, 41 U.S.C. § 4712 *et seq*.

5.     This Court maintains personal jurisdiction over the Defendant because Defendant maintains offices in the District of Columbia, located at 1201 Connecticut Ave., NW, #400, Washington, District of Columbia 20036, and purposely avails itself of the privilege of conducting activities within the District of Columbia.

6.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b)(1) because Defendant maintains residency in the District of Columbia and is subject to this Court's personal jurisdiction.

## THE PARTIES

7.    Christopher Carzoli, Plaintiff, has worked for Defendant since November 1992 and is presently employed by Defendant.

8.    Christopher Carzoli is an employee within the meaning of the NDAA, 41 U.S.C. § 4712(a)(1).

9.    Donald May, Plaintiff, has worked for Defendant since 2004 and is presently employed by Defendant.

10.    Donald May is an employee within the meaning of the NDAA, 41 U.S.C. § 4712(a)(1).

11.    Manfred Hanspeter, Plaintiff, has worked for Defendant since 1988 and is presently employed by Defendant.

12.    Manfred Hanspeter is an employee within the meaning of the NDAA, 41 U.S.C. § 4712(a)(1).

13.    Defendant is a federally-funded broadcasting service, established in 1950, for the purpose of bringing free press to former-Soviet controlled countries during the Cold War.  Today, Defendant provides news to countries where freedom of the press is limited or the sharing of information is heavily censored and maintains offices around the world, including in the District of Columbia and the Czech Republic at Vinohradska 159A 100 00 Prague 10, Czech Republic.

14.    Defendant is a Federal grantee of the Broadcasting Board of Governors ("BBG") within the meaning of the NDAA, 41 U.S.C. § 4712(a)(1).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.    Each Plaintiff has properly exhausted administrative remedies as required before being able to file this lawsuit.

16.     In November 2015, Plaintiffs Carzoli and May initiated a whistleblower complaint with OIG alleging unlawful retaliation by Defendant in violation of the NDAA.

17.     In February 2016, Plaintiff Hanspeter initiated a whistleblower complaint with OIG alleging unlawful retaliation by Defendant in violation of the NDAA.

18.     OIG completed its investigations into Plaintiffs Carzoli and May's whistleblower complaints in October 2016 and Plaintiff Hanspeter in January 2016.   In each Report of Investigation issued in the respective cases, OIG concluded that Defendant retaliated against Plaintiffs following their disclosures.

19.     Following Plaintiffs Carzoli and May's receipt of OIG's reports, each offered submissions to BBG in support of an award for damages and other appropriate relief in or about November 2016.

20.     On December 6, 2016, notwithstanding the overwhelming evidence supporting OIG's conclusions, BBG adopted OIG's conclusions but rejected Plaintiffs Carzoli and May's requested relief.

21.     In May 2017, Plaintiff Hanspeter offered a submission to BBG in support on award of damages and other appropriate relief.

22.     To date, BBG has not issued a decision regarding relief in Plaintiff Hanspeter's case.

## STATEMENT OF FACTS

23.     Defendant hired Plaintiff Hanspeter in 1988 as Laboratory Engineer.   Plaintiff Hanspeter was later promoted to Senior Engineer and, in or around 1997, Director of Telecommunications and Network.

24.     Plaintiff Hanspeter served in the position of Director of Telecommunications and Networks for approximately twenty years until 2015. As Director of Telecommunications and Networks, Mr. Hanspeter and his staff of ten employees were charged with ensuring the comprehensive, integrated, reliable, and high-equality local area networking, network facilities infrastructure, internet access, high-performance networking, network security, remote access to corporate IT service, and telecommunications, for RFE/RL.

25.     Defendant hired Plaintiff Carzoli in or about November 1992 as a transmitter operator. Plaintiff Carzoli subsequently assumed the role of acting Station Manager of the Biblis and Lampertheim, Germany transmitting stations.  Defendant later promoted Plaintiff Carzoli to Deputy Director of Broadcast Operations, then Director of Broadcast Operations, and then to Deputy Director of Technology in Prague, the Czech Republic.

26.     Plaintiff Carzoli served as Deputy Director of the Technology Division from 2003 to 2015.  As Deputy Director of Technology, Plaintiff Carzoli was responsible for the day-to-day operations of the Defendant's Technology Division and supervised approximately ninety employees at any given time.

27.     Plaintiff May began his employment with Defendant in or about November 2004 as the Director of the Operations Center, which routed all broadcast signals in and out of Defendant and ensured all recorded programming was broadcast on air.

28.     Defendant promoted Plaintiff May to Director of Technical Operations in 2008. In this position, Plaintiff May's responsibilities included overseeing facilities management and the operations center, which required him to frequently review and approve any facilities invoices. Later, Plaintiff May also assumed management of Defendant's broadcast engineering group, which

was responsible for the installation and repair of Defendant's facility equipment. In doing so, Plaintiff May maintained his title of Director of Technical Operations.

29.     In their respective roles, each was entrusted with oversight of decisions regarding the spending and purchasing in Defendant's technology division.

30.     During Plaintiffs' many years of employment, Defendant did not raise any serious performance concerns about Plaintiffs. To the contrary, Plaintiffs always received excellent performance reviews with the highest or second-highest ratings and frequently received performance awards and bonuses.

31.     In or about June 2012, L88 Investments ("L88") purchased the building housing Defendant's headquarters. Thereafter, L88 and Defendant entered a lease agreement that made L88 responsible for paying all building maintenance and utility bills and associated costs.

32.     Defendant paid the building's utilities and maintenance costs directly to L88 in advance, and L88 was to pay the utilities and building maintenance costs to the providers and various vendors, respectively. Upon information and belief, the actual operation and maintenance of the building were to remain Defendant's responsibilities under the lease agreement.

33.     On or about May 10, 2013, Plaintiff Carzoli learned of discrepancies in L88's invoicing and that L88 had removed the Facilities Management Department's access to Defendant's Building Management System ("BMS") and to its Google Doc accounts, which recorded building management and utilities payments to reconcile potential discrepancies.

34.     Plaintiff Carzoli emailed Defendant's Interim Chief Executive Officer, John Giambalvo, and its then-Acting General Counsel, Ben Herman, to report his concern about gross mismanagement, waste of funds, abuse of authority, and potential violations of law, including 18 U.S.C. § 371, Conspiracy to Defraud the United States, and 18 U.S.C. § 1031, Crime of Major

Fraud Against the United States. Specifically, Plaintiff Carzoli reported the discrepancies in invoices and that the Facilities Management Department could not verify if "payments [were] invoiced correctly." Plaintiff Carzoli noted that "L88 seems to want absolutely no scrutiny of their activities".

35.     Neither Giambalvo nor Herman responded to Plaintiff Carzoli's complaints. Plaintiff's Carzoli and May continued to communicate similar concerns, including about L88's invoicing practices with Giambalvo, and others in senior management, throughout 2013.

36.     In or around October 2013, William Key resigned from his position of Director of Corporate Security at Defendant and joined L88 as a vice president. Upon information at belief, at the time he joined L88, Key was aware of Plaintiffs' protected disclosures.

37.     Over the course of the next several years, Plaintiffs learned that L88 engaged in additional acts of gross mismanagement, waste of funds, abuse of authority, and potential violations of law, rule or regulation. For example, in or about June 2014, the building facilities management company, KART, abruptly stopped providing services to Defendant because L88 failed to pay the invoices.

38.     Similarly, the building's cleaning services company, RPM, halted its cleaning services in or about August 2015 because L88 also failed to pay its invoices. Plaintiffs also learned that the building's maintenance company, Rossi, terminated its contract due to L88's nonpayment and the electric company threatened to terminate service if it was not paid.

39.     On several occasions, vendors complained directly to Plaintiffs about L88's failure to pay them for the services provided. Plaintiffs ultimately learned that approximately forty vendors, all of whom provided services to Defendant, had not been properly compensated by L88 despite the fact that Defendant had provided the funds to L88.

40.     Plaintiffs also learned that L88 requested Defendant's approval of the development of a new TV Studio, which would provide an additional $300,000 in funds to be distributed to L88.

41.     Additionally, Plaintiffs learned that L88 improperly represented that it was affiliated with the U.S. Government and Defendant in order to intimidate vendors and attempted to interfere with the operations of Defendant. For example, L88's wireless internet continuously interfered with Defendant's wireless network and L88 utilized large portions of the office space rented by Defendant without providing the appropriate offsets.

42.     After no action was taken by Defendant's management officials regarding the improper invoicing practices of L88 and the other mismanagement concerns, Plaintiffs jointly complained to Andre Mendes, the BBG Chief Information Officer/Chief Technology Officer ("CIO/CTO"), in early 2014 about the gross mismanagement, waste of funds, abuse of authority, and potential violations of law, described in the paragraphs above.

43.     BBG's CIO/CTO discussed Plaintiffs' complaints with Giambalvo.

44.     Because Giambalvo failed to sufficiently resolve the concerns raised by Plaintiffs, Mendes brought Plaintiffs' complaints to the attention of BBG's Board.

45.     On or about September 12, 2014, BBG's Board ordered an internal investigation into L88's interferences with Defendant's operations and the issues raised by Plaintiffs.

46.     The investigation, conducted by Defendant's General Counsel and Benjamin Herman, occurred in or about October 2014. Plaintiffs each participated in the internal investigation and communicated their concerns to Herman.

47.     Both Herman and Giambalvo were aware that Plaintiffs had complained to BBG and that their actions resulted in BBG's instruction to conduct an internal investigation.

48.     During the internal investigation, Plaintiffs disclosed their concerns about the potentially unethical relationship that L88 leadership and Defendant leadership maintained, which resulted in L88's improper interference with Defendant's mission and abuse of authority, Defendant and L88's lack of transparency about its decision-making, and L88 and Defendant's potential mismanagement and/or waste of funds, including concerns about the failure to properly pay invoices.

49.     On or about October 24, 2014, BBG's General Counsel submitted a report to BBG's Board that criticized Defendant and L88's relationship and concluded that some of Defendant and L88's activities violated Federal law and Defendant's ethics rules. The report explicitly included Plaintiffs' disclosures.

50.     Plaintiffs' continued to provide information to Herman through the beginning of 2015.

51.     Almost immediately after the investigation's completion, Defendant's senior officials identified Plaintiffs as engaging in, condoning, or failing to prevent gross mismanagement and gross waste of Federal funds and potential violations of law, rule, or regulation, during BBG's investigation, and began making unjustified personnel changes, listed below.

52.     In or about October 2014, then-Co-interim-Chief Executive Officers Giambalvo and Nenad Pejic inexplicably hired Sardy Bernard as a consultant to assess Defendant's Technology Division despite the fact that the Division had been performing successfully.

53.     In his consultant report of October 31, 2014, just weeks after the internal investigation concluded, Bernard conveniently advised Defendant to create a Chief Technology Officer ("CTO") position, which encompassed many of the duties performed by Plaintiffs.

54.     In November 2014, less than a month after the internal investigation concluded, Giambalvo instructed the then-Human Resources Director to send him a list of employees who received the highest performance ratings.

55.     Shortly after the Human Resources Director forwarded Giambalvo the list he requested, the Director of Technology was directed to retroactively downgrade the ratings of some of the Technology Division's staff.

56.     The Director of the Technology Division selected five employees to downgrade, three of which were the Plaintiffs. These names were forwarded to Giambalvo, who objected to the inclusion of two employees who had not raised concerns about Defendant and L88's relationship and conduct. Upon information and belief, only Plaintiffs were selected to have their performance ratings downgraded.

57.     Defendant also hired Susan Reed Jackson as Director of Technical Operations in January 2015. Jackson's position mirrored many of Plaintiff May's responsibilities and effectively made Plaintiff May's job obsolete.

58.     Ms. Jackson was also assigned additional duties within the Technology Division, including all of the Division's bureau projects, hiring, and technology purchasing, which undermined Plaintiff Carzoli's duties.

59.     Around the same time, Giambalvo inexplicably removed the Network Team from Mr. Hanspeter's oversight. Giambalvo placed the Network within the Internet Team directly under his office, and appointed Ray Ludendorff, Plaintiff Hanspeter's Deputy Director, to head the Network department, significantly curtailing Mr. Hanspeter's responsibilities and authority.

60.     To date, Defendant has not hired a new Deputy Director to replace Ludendorff and assist Hanspeter.

61.     After Defendant's management continued to ignore Plaintiffs' complaints about potential misconduct, Plaintiffs jointly wrote to the State Department's Office of Inspector General ("OIG") and the Federal Bureau of Investigation ("FBI") in or about February 2015 to report their concerns.   In their joint letter, they expressed concerns regarding "the mismanagement and possible malfeasance in the spending of significant portions of [Defendant]'s $100 million annual budget" and about L88's "unusual level of unprecedented involvement" in the day-to-day activities of Defendant.   Plaintiffs further highlighted how L88's and Defendant's practices directly impacted the operational and physical security of Defendant and the possible conflict of interest created by the alignment of Defendant and L88's corporate offices within Defendant's building and headquarters.   Plaintiffs' letter also informed OIG and the FBI that a "non-profit, tax-payer funded […] organization is being leveraged for the financial gains of a third party," and that L88's officers improperly represented themselves as associates of Defendant in meetings with government officials.

62.     Upon information and belief, both the OIG and FBI commenced an investigation into Plaintiffs' allegations.   Plaintiffs subsequently provided the OIG and FBI with documents and details supporting their complaints about the mismanagement and waste of funds, abuse of authority, and potential violations of law, rules, and regulations, including information related to the unpaid invoices.

63.     In the months following Plaintiffs disclosures to the FBI and OIG, Defendant inexplicably continued to obviate Plaintiffs' roles and systematically exclude them from decisions they had previously been involved in.   In or about July 2015, Defendant created the CTO position Bernard had recommended in his October 2014 report and hired Bernard to the newly-created position, making Plaintiffs' Bernard's subordinates.   Defendant never internally or externally

advertised to fill this newly-created position. Additionally, Bernard's duties subsumed many of Plaintiffs' previous duties. For example, Bernard, as CTO, communicated directly with Defendant's senior technology supervisors and effectively eliminated Plaintiff Carzoli from the chain of command, which divested Plaintiff Carzoli of his primary responsibilities within Defendant.

64.     Following Bernard's appointment as CTO, Defendant's senior management, including Pejic, instructed him to terminate Plaintiffs employment with Defendant. Bernard declined to do so because Plaintiffs possessed invaluable institutional knowledge.

65.     Defendant continued its elimination of Plaintiffs' responsibilities and escalated its efforts to oust Plaintiffs from employment with Defendant. For example, Defendant denied Plaintiffs annual raises and performance bonuses and continued to re-organize the Technology Division in a manner unfavorable to Plaintiffs.

66.     Plaintiffs continued providing information to OIG and the FBI throughout 2015.

67.     In or about September 2015, OIG travelled to Prague to conduct an on-site investigation into Plaintiffs' allegations regarding Defendant's waste, fraud, abuse of authority, and misconduct.

68.     Management officials, including Pejic, were aware that Plaintiffs participated in the investigation. Pejic witnessed Plaintiff May providing information to OIG investigators. Upon information and belief, Defendant management officials also knew that Plaintiffs had initially contacted OIG.

69.     On or about September 15, 2015, approximately two days before Plaintiffs met with OIG investigators, Plaintiff Carzoli emailed Herman and Mendes and explicitly informed them about his upcoming interview with OIG.

70.     Within a month of participating in the OIG investigation, in or about October 2015,
Bernard informed Plaintiff Carzoli that Defendant intended to permanently adjust their positions
and that they were on a "kill list." Upon information and belief, Bernard informed other Defendant
management officials, including Luke Springer, that Plaintiffs were on a "kill list."

71.     In a meeting with Plaintiffs in October 2015, approximately one month after OIG
conducted an on-site investigation, Bernard provided Plaintiffs with a draft of a new organization
chart that identified Plaintiff May as Acting Director of Broadcast Engineering.

72.     The new organization chart also eliminated Mr. Carzoli's role as Deputy Director
of Technology demoting him to the position of Director of Project Management, a new Division
with only one other employee whom Plaintiff Carzoli would supervise.

73.     Shortly thereafter, in a follow-up meeting, Bernard informed Plaintiff Hanspeter
that he would be demoted to Director of the Telecommunications Division and that Plaintiff
Hanspeter's former deputy would oversee the Networks and Telecommunications Division.
Bernard also informed May that Defendant intended to advertise to fill the now vacant permanent
position of Director of Broadcast Engineering.

74.     On November 1, 2015, Defendant issued Plaintiffs official "Addendum[s] to
Employment Agreement" indicating their new positions.

75.     Defendant provided no explanation for its decision to reassign and effectively
demote Plaintiffs.

76.     That same month, Plaintiffs Carzoli and May subsequently filed whistleblower
complaints with OIG under 41 U.S.C. § 4712.  In their complaints, Plaintiffs Carzoli and May
alleged that Defendant was subjecting them to continuous reprisal for disclosing their concerns
about Defendant's waste, fraud, abuse of authority, and misconduct.

77.    In or about mid-November 2015, Elizabeth Hallin, Human Resources Director, emailed each Plaintiff, warning that Defendant intended to terminate Plaintiffs' employment if they refused to accept their reassignments. Faced with no choice, Plaintiffs accepted their new, lesser positions.

78.    Plaintiff May subsequently applied to fill the vacancy of the position he previously maintained. Upon information and belief, however, Bernard expressed he maintains "no desire" to have Plaintiff May fill the permanent position. Defendant has not selected Plaintiff May to fill his former position and the position remains vacant to date.

79.    Since then, Defendant has continued to reduce and diminish Plaintiffs' responsibilities. For example, in or about January 2016, Defendant blocked Plaintiff May's access to facilities management account in PeopleSoft, although it was later restored, which impeded Plaintiff May's ability to perform his remaining job responsibilities.

80.    Around the same time, in January 2016, Defendant instructed Plaintiff Hanspeter to relocate his office to a storage space, although it later rescinded its decision.

81.    In February 2016, Plaintiff Hanspeter filed a whistleblower complaints with OIG under 41 U.S.C. § 4712. In his complaint, Plaintiff Hanspeter alleged that Defendant was subjecting him to continuous reprisal for disclosing his concerns about Defendant's waste, fraud, abuse of authority, and misconduct.

82.    Defendant intentionally understaffed Plaintiffs' departments, assigned impossible tasks and projects to complete, and provided unjustified poor performance evaluations, which eliminated any possibility of merit based awards or salary adjustment.

83.    Upon information and belief, Defendant's senior officials, including Herman, continue to seek ways to terminate Plaintiffs' employment.

84.     Defendants repeated and continuous retaliatory acts against Plaintiffs continue to cause Plaintiffs immediate, substantial, and irreparable injury.

## CAUSE OF ACTION AND REQUEST FOR INJUNCTIVE RELIEF

### Retaliation in Violation of the National Defense
### Authorization Act For Fiscal Year 2013, 41 U.S.C. § 4712.

85.     Plaintiffs, Christopher Carzoli, Manfred Hanspeter, and Donald May, re-allege and incorporate the allegations set forth above as though each and every allegation is fully set forth.

86.     At all times material, Plaintiffs Carzoli, Hanspeter, and May were and remain "employee[s] of a contractor, subcontractor, grantee, or subgrantee or personal services contractor" as defined at and provided for under the National Defense Authorization At for Fiscal Year 2013 (the "Act"). *See* 41 U.S.C. § 4712(a).

87.     At all times material, Defendant was and remains a government instrumentality and grantee as contemplated within the meaning of the Act. *See* 22 U.S.C. § 6204(a)(5) (2005); *id.* at § 6207 *et seq.*; *id.* at § 6211 *et seq.*

88.     Plaintiffs initiated, reported, and provided to a "person or body", within the meaning of the NDAA, including to OIG, FBI, a management official who has the responsibility to address misconduct, and to a Federal employee responsible for grant oversight or management, evidence that they reasonably believed demonstrated L88 and Defendant's misconduct relating to mismanagement of a Federal contract; to gross waste of Federal funds; to abuses of authority relating to a Federal contract or grant; and to violations of law, rules, and regulations related. *See* 41 U.S.C. § 4712(a)(1); *id.* at § 4712(a)(2); *id.* at § 4712(g)(2).

89.     Defendant was aware of Plaintiffs protected disclosures.

90.     Defendant was prohibited from discharging, demoting, or otherwise discriminating against Plaintiffs in reprisal.

91.     Defendant unlawfully retaliated against Plaintiff Carzoli in violation of 41 U.S.C. § 4712(a)(1) for engaging in protected activity and making protected disclosures when it diminished his duties, undermined his authority, provided him with an unjustified performance evaluation, placed him on a "kill list", demoted him to Director of Project Manager, and assigned him tasks that were impossible to complete.

92.     Defendant unlawfully retaliated against Plaintiff Hanspeter in violation of 41 U.S.C. § 4712(a)(1) for engaging in protected activity and making protected disclosures when it diminished his duties, undermined his authority, provided him with an unjustified performance evaluation, placed him on a "kill list", removed the Networks Department from his supervision, removed and failed to replace his Deputy Director, demoted him to Director of Telecommunications, and assigned him tasks that were impossible to complete.

93.     Defendant unlawfully retaliated against Plaintiff May in violation of 41 U.S.C. § 4712(a)(1) for engaging in protected activity and making protected disclosures when it diminished his duties, undermined his authority, provided him with an unjustified performance evaluation, placed him on a "kill list", demoted him to Acting Director of Broadcast Engineering, advertised his position and subsequently failed to select him for the permanent position, and assigned him tasks that were impossible to complete.

94.     Plaintiffs Carzoli, Hanspeter, and May have suffered significant harm as the result of Defendant's retaliation in violation of 41 U.S.C. § 4712(a)(1).

95.     Plaintiffs Carzoli, Hanspeter, and May are entitled to such legal or equitable relief as will effectuate the purpose of the NDAA, including, but not limited to, abatement of Defendant's retaliation, reinstatement to the positions Plaintiffs held before Defendant's reprisal, economic and compensatory damages, and reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, Christopher Carzoli, Manfred Hanspeter, and Donald May, pray that this Honorable Court adjudge the following:

A.      That Defendant be found in violation of the National Defense Authorization Act for Fiscal Year 2013's enhancement of contractor protections from reprisal for disclosure of certain information, Pub. L. No. 112-239, § 828(a)(1), 126 Stat. 1632 (2013) (codified as amended by Pub. L. No. 114-261, § 795, 130 Stat. 1362, at 41 U.S.C. § 4712 (2016); and

B.      That Defendant be ordered to pay Plaintiffs an amount sufficient to fully compensate them (including tax consequences) for their economic losses, including lost wages and benefits, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal; and

C.      That Defendant be ordered to pay compensatory (non-economic) damages, in an amount to be determined at trial, but in no event less than $300,000 each; and

D.      That Defendant be ordered to pay exemplary damages, to be determined at trial, to punish Defendant for malicious acts of retaliation and to deter it from similar retaliatory conduct toward other employees; and

E.      That Defendant be ordered to reinstate Plaintiff Carzoli to the position of Deputy Director of Technology; and

F.      That Defendant be ordered to reinstate Plaintiff Hanspeter to the Director of Telecommunications and Networks; and

G.      That Defendant be ordered to reinstate Plaintiff May to Director of Broadcast Engineering and Technical Operations; and

H.      That Defendant be immediately enjoined from any further retaliatory conduct against Plaintiffs; and

G.      That Defendant be ordered to issue a public apology to all Plaintiffs for the unlawful retaliation to which they have been subjected; and

H.      That Defendant be ordered to conduct mandatory training for all of its management officials and employees on the rights and responsibilities that the NDAA's anti-retaliation provisions require; and

I.      That Defendant be ordered to post the order granting relief to Plaintiffs throughout Defendant's offices and to distribute it to all Defendant's personnel; and

J.      That Defendant be ordered to take all measures needed to prevent any further retaliation against any of the Plaintiffs including but not limited to disciplining those responsible for committing the retaliatory acts; and

K.      That Defendant be ordered to create new internal complaint procedures designed to provide an effective procedure for employees to report workplace concerns, particularly about those related to mismanagement of a Federal contract or grant, gross waste of Federal funds, abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or violation of law, rule, or regulation related to a Federal contract or grant;

L.      That Defendants be ordered to pay reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

M.      That the Court grant other injunctive or equitable relief, as may be appropriate, to prevent further harm to Plaintiffs, to others, and to the public caused by Defendant's retaliation against whistleblowers; and

N.      That the Court grant any other such relief that the Court may deem just and equitable, and as the nature of the cause may require.

<h2 style="text-align:center">DEMAND FOR A JURY TRIAL</h2>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Plaintiffs demand a jury trial as to all issues so triable.

Dated: October 20, 2017                         Respectfully submitted,


Gary M. Gilbert, Esq. (Bar No. MD15808)
Cori M. Cohen, Esq. (Bar No. MD19124)
Alexis N. Tsotakos, Esq. (Bar No. 1000876)
Gilbert Employment Law, P.C.
1100 Wayne Ave., Suite 900
Silver Spring, MD 20910
Tel: (301) 608-0880;  Fax: (301) 608-0881
gary@gelawyer.com
ccohen@gelawyer.com
atsotakos@gelawyer.com